UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 18-25474-CIV-RUIZ

MUSIC SPECIALIST, INC., a Florida Corporation,
and SHERMAN NEALY, an individual,

      Plaintiffs,

v.

ATLANTIC RECORDING CORPORATION, et al.,

      Defendants.

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Atlantic Recording Corporation ("Atlantic"), Warner Chappell Music, Inc. ("WCM") and Artist Publishing Group, LLC ("APG") (collectively, "Defendants"), by and through undersigned counsel, and pursuant to Rule 56, Fed. R. Civ. P., hereby move for summary judgment as to all claims asserted by Plaintiffs Sherman Nealy ("Nealy") and Music Specialist, Inc. ("MSI") (collectively, "Plaintiffs"), and in support thereof state as follows:

## PRELIMINARY STATEMENT

This case represents the latest installment in a decades-long legal battle among various parties claiming overlapping rights in musical compositions and sound recordings authored by 1980s recording artist Tony Butler ("Butler"). After *five* prior litigations in which numerous parties disputed ownership rights of Butler's musical works, Plaintiffs filed this lawsuit, alleging that they, in fact, are the true copyright owners of Butler's musical works and that Defendants are infringing Plaintiffs' copyrights even though Defendants have licenses for the use of Butler's works from Butler himself.

Plaintiffs have never provided proof supporting their claim of ownership of the music at issue and have never produced any writings showing that Butler assigned his rights to them, which is required under the Copyright Act's statute of frauds.  Nor do Plaintiffs have any plausible explanation for why they waited so many years to assert these rights against the Defendants – long past the Copyright Act's three-year statute of limitations.  After Defendants were forced to file multiple motions to dismiss, which resulted in Plaintiffs' multiple amendments to their complaint, and after a period of discovery during which Plaintiffs effectively admitted they have no claims, this case is ripe to be summarily dismissed.

Defendants move for summary judgment on three independent grounds, each of which independently justifies dismissal of this case.  In order to prove a copyright violation, Plaintiffs must first prove that they own the copyrights in question.  Basic principles of copyright law provide that copyright ownership vests initially with the author of a work, in this case Butler, and remains with that author unless he has assigned the copyright to another party in a signed writing.  *See* 17 U.S.C. §§ 201(a) and 204(a).  Plaintiffs readily admit that they have no such writing and will be unable to produce one.  Their entire case collapses on that basis alone.

Plaintiffs nevertheless try to excuse the absence of a writing by relying on the statutory presumption of validity attaching to their copyright registration certificates, in which they identified Butler as the author but indicated that he assigned the works to them.  However, as the Eleventh Circuit has held, that presumption is easily rebutted when the defendant adduces "some evidence" casting doubt on the facts stated in the registration certificate.  Here, there is an abundance of evidence casting doubt on the accuracy of Plaintiffs' registration certificates.  Among other things, Plaintiffs are not even the copyright claimants on certain of the registrations at issue, there are competing registrations in the names of third parties, and there have been

2

multiple lawsuits and settlement agreements in which other parties have claimed rights to the same musical works that Plaintiffs claim to own in this case.  Even more damning, Plaintiffs' own testimony and sworn interrogatory responses flatly contradict what the registration certificates say, including with regard to who authored which works, whether other writers were involved, and whether any assignment agreements were ever prepared or executed by Butler. Amidst the contradictions and shifting stories, Plaintiffs have been unable to present any plausible theory of ownership, and thus cannot survive summary judgment.

As a second ground for dismissal, Plaintiffs have sworn in interrogatory responses and confirmed in sworn testimony that Butler remains a co-owner, along with Plaintiffs, of the copyrights in question.  Since co-owners of copyrights are treated as tenants-in-common, with each having an independent right to use or license the copyrights they jointly own, any licensee who obtains a license from one co-owner is immune from suit by another co-owner.  In this case, there is no dispute that all three Defendants obtained licenses from Butler to use the musical compositions in question.  While Plaintiffs call those licenses "unlawful," Butler had every right to grant them as a matter of law.  These undisputed facts, based on Plaintiffs' own admissions, provide a second independent ground for dismissal.

Apart from these substantive deficiencies, Plaintiffs' claims are also clearly barred by the Copyright Act's three-year statute of limitations.  The Eleventh Circuit has recently held that when a copyright infringement case hinges entirely on whether the plaintiff owns the works in question, the claim is characterized as an "ownership dispute" and is extinguished altogether if the plaintiff knew or should have known that his or her copyrights were being exploited more than three years prior to filing suit.  Here, Plaintiffs undisputedly had both actual and constructive notice of their claims for far longer than three years prior to filing suit.  They were

31003/019/3574338.2
#42583456 v1

aware of the prior litigations, had meetings asserting their rights to Butler's songs starting in 2008, received royalty statements showing that Defendant WCM was administering their purported copyrights, and sat idly by while Defendants' alleged infringements became "smash hits" more than a decade ago. Plaintiffs have no justification to excuse their delay. Moreover, even if Plaintiffs could justify such delay, they would in any case be limited to relief dating back three years from the date this lawsuit was filed.

A copyright plaintiff is expected to come to court prepared with some evidentiary basis for how it claims to own works that were created by others and some proof that it has raised its claims in a timely fashion. Plaintiffs in this case have defaulted entirely on these threshold obligations. They have no objectively reasonable basis for suit, and their case should be dismissed on summary judgment.

## SUMMARY OF FACTS

For a full recitation of the facts relevant to this motion, Defendants respectfully refer the Court to Defendants' Statement of Material Facts ("SMF"), accompanied hereto. Additionally, facts specifically relevant to the legal arguments below are included in those sections. For the Court's convenience, a short summary of the facts underlying this dispute follows.

1.      Plaintiff MSI is a Florida corporation that, at one time, was engaged in the music business. MSI Corporate Records, Composite Exh. A; Nealy Depo., Exh. B, at p. 60. Plaintiff Nealy claims to be the principal of MSI and has also sued in his individual capacity. MSI Corporate Records, Composite Exh. A; Third Amended Complaint ("TAC"), at ¶¶ 9, 17.

2.      MSI was incorporated as a Florida corporation in 1983. Nealy Dep. at 32. At that time and for approximately seven months thereafter, its corporate records filed with the Florida

Secretary of State identified Butler as the President of MSI and Nealy as its Vice President.  MSI Corporate Records, Composite Exh. A.

3.       Thereafter, on April 16, 1984, MSI's Articles of Incorporation were amended to switch those two positions, such that Nealy became President and Butler became Vice President. MSI Corporate Records, Composite Exh. A; Nealy Depo., Exh. B, at p. 51; Black Depo., Exh. C, at p. 112.  Nealy claims that he appointed Butler as Vice President because he needed another officer of the company and Butler was the only person he felt he could trust.  Nealy Depo., Exh. B, at pp. 53, 222; Black Depo., Exh. C, at p. 118.  Butler was a disc jockey and was more knowledgeable than Nealy about the music business.  Nealy Depo., Exh. B, at p. 221; Black Depo., Exh. C, at p. 118.

4.       The formation of MSI was Nealy's first attempt to enter the music business. Nealy Depo., Exh. B, at p. 213.  He formed MSI because he wanted to attract artists for a record company and to bring in the various talent needed to make recordings.  Nealy Depo., Exh. B, at pp. 217-219.

5.       While Nealy was the "money man," funding the operations of MSI (Nealy Depo., Exh. B, at p. 152), Butler was more actively involved in the day-to-day business of MSI.  Black Depo., Exh. C, at p. 178; Nealy Depo., Exh. B, at p. 157.

6.       For those few years MSI was actively engaged in the music business, it had between five and seven individuals on its payroll, including Butler.  Nealy Depo., Exh. B, at pp. 56-57.  Butler was employed by MSI as "an engineer, operating a mixing board" to produce sound recordings.  Nealy Depo., Exh. B, at pp. 58, 199-200.  Butler was not paid by MSI to be a songwriter.  Nealy Depo., Exh. B, at p. 193.

31003/019/3574338.2
#42583456 v1

7.      The recording artists who performed on sound recordings released by MSI included Debbie Deb, Trinere and Freestyle Express.  Nealy Depo., Exh. B, at p. 61.  MSI recorded and released one album and numerous singles on vinyl and cassette during the approximately three years it was in operation, from 1983 to 1986 (the "MSI catalog").  Nealy Depo., Exh. B, at pp. 60, 86-89.  The musical compositions at issue in this case are a subset of the MSI catalog.  Nealy Depo., Exh. B, at pp. 86-87.

8.      MSI's sole means of distributing its music was through independent distributors, including mom-and-pop record stores.  Nealy Depo., Exh. B, at pp. 92-93.  Nealy never authorized third-party distributors to help distribute or sell MSI's music; all distribution was performed "in house" by selling physical product directly to record stores.  Nealy Depo., Exh. B, at pp. 65, 92-93.

9.      Although neither Nealy nor MSI can produce any business or accounting records of MSI, Nealy believes that MSI "probably lost money when it was in business."  Nealy Depo., Exh. B, at p. 66.

10.     MSI was involuntarily dissolved as a Florida corporation on November 14, 1986 and remained a defunct entity until it was reinstated in 2017.  MSI Corporate Records, Composite Exhibit A.

11.     In or around March 1989, any business operations of MSI came abruptly to an end when Nealy was incarcerated for distributing cocaine (the "first incarceration").  Black Depo., Exh. C, at p. 112.

12.     During the period of Nealy's first incarceration, no one was authorized by Nealy to distribute or license any of the MSI catalog.  Nealy Depo., Exh. B, at pp. 67-68, 94-95.  MSI

6

had no contracts with third parties to publish or distribute the MSI catalog.  Nealy Depo., Exh. B, at p. 94.

13.     During the period of his first incarceration, Nealy made no effort to stay involved in the music business and made no effort to communicate with his former colleagues from MSI or anyone in the music business.  Nealy Depo., Exh. B, at pp. 67-68, 216-127.

14.     Nealy remained incarcerated from approximately March 1989 to March 2008. Nealy Depo., Exh. B, at pp. 26-27; Incarceration Records, Composite Exh. D.

15.     Upon his release from prison in March 2008, Nealy learned that a third party, Robert "Bo" Crane ("Crane") was distributing the MSI catalog which MSI claims to own.  Nealy Depo., Exh. B, at p. 68.

16.     During 1989-1992, two companies owned by Butler – Captain Productions, Inc. and C-Tan Music – allegedly transferred rights to musical works in the MSI catalog, including many of the works at issue in this case, to Robert Crane's companies, Pandisc Music Corporation ("Pandisc") and Whooping Crane Music, Inc. ("Whooping Crane").  *See* 2009 Complaint, Exh. E.

17.     Nealy arranged a meeting to discuss Crane's allegedly unauthorized use of the MSI catalog.  Although Nealy confronted Crane about this unauthorized use, Nealy took no action to stop the use for *nine years*.  Nealy Depo., Exh. B, at pp. 77-79.

18.     In fact, during the four years following his first incarceration, from approximately 2008-2012, Nealy completely failed to investigate the allegedly unauthorized use of MSI's catalog or demand that it be stopped.  Nealy Depo., Exh. B, at pp. 82-83.  During this four-year period, Nealy allowed the MSI catalog to be exploited without his permission.  Nealy Depo., Exh. B, at pp. 80-81.

7

19. From approximately 2008 to 2012, Nealy never resumed participating in the music business. Nealy Depo., Exh. B, at p. 217. As he explained, "I didn't want to return to the music industry." Nealy Depo., Exh. B, at p. 215.

20. Atlantic is a record company that produces, markets and distributes sound recordings. TAC, at ¶¶ 13-14.

21. WCM is a music publishing company engaged in the business of licensing musical compositions. WCM also provides administrative services on behalf of songwriters and other music publishers, as it did on behalf of Defendant APG in this case. Blietz Decl., Exh. F, at ¶ 2.

22. APG is a music publishing company engaged in the business of licensing musical compositions. Caren Depo., Exh. G, at pp. 48-50.

23. In February 2008, Atlantic obtained a license from Butler and his company, 321 Music, LLC ("321 Music"), to use portions of the composition "Jam The Box" as an interpolation in the composition "In The Ayer," embodying the performance of the recording artist Tramar Lacel Dillard p/k/a Flo Rida. Atlantic used DMG Clearances ("DMG"), a reputable copyright clearing house, to obtain the license from Butler, and DMG negotiated the terms of the license with an attorney who represented Butler, 321 Music and "Music Specialist."[1] Exh. H.

24. In or around July 2008, APG entered into a publishing administration agreement with Butler and 321 Music (the "APG/321 Music Agreement") for the administration of what

---

[1] Music Specialist, Inc., the named Plaintiff in this case is, as stated above, a Florida corporation. Atlantic obtained its license to use the composition "Jam The Box" from a lawyer claiming to represent "Butler/Music Specialist Publishing."

8

was represented to APG to be the Butler/321 music catalog, and which included the compositions in the MSI catalog that are at issue in this case.  APG Administration Agreement with Butler/321 Music, Exh. I.

25.     Upon execution of the APG/321 Music Agreement, WCM began providing administration services for the musical compositions covered by the APG/321 Music Agreement based on a preexisting contractual arrangement between WCM and APG.  J. Blietz Decl., Exh. F, at ¶ 3.

26.     As of 2008, when WCM and APG commenced administering the Butler/321 music catalog and Atlantic licensed the use of "Jam The Box" from Butler through DMG, the corporate records of MSI as filed with the Secretary of State's office listed Butler as an officer of MSI, a dissolved company.  MSI Corporate Records, Exh. A.

27.     After Nealy returned to prison for the second time on February 10, 2012 (the "second incarceration"), he did not communicate with anyone in the music business.  Nealy Depo, Exh. B, at p. 217.  As was the case during his first incarceration, Nealy claims that no one was authorized to sell or otherwise distribute the MSI catalog, and that any distribution of the MSI catalog by anyone from the time of Nealy's first incarceration through and including the filing of the present action in 2018 was not authorized by Nealy on behalf of MSI.  Nealy Depo., Exh. B, at pp. 94-95.

28.     MSI was reinstated as a corporation with the Florida Secretary of State's office in January 2017.  MSI Corporate Records, Exh. A; Nealy Depo., Exh. B, at p. 64.  Nealy claims that MSI's reinstatement followed a long period of involuntary dissolution resulting from Nealy's incarceration.  *Id.* at p. 64.

9

29.     MSI did not conduct any business during its 21 years of dissolution and did not license any of the musical compositions in the MSI catalog to any third parties for commercial exploitation.  Nealy Depo., Exh. B, at pp. 65-66.

30.     Plaintiffs have been unable to produce any documents relating in any way to the business of MSI.  Nealy Depo., Exh. B, at p. 301.

31.     The MSI catalog has been the subject of numerous litigations prior to this case dating back to 2006, including the following:

*Pandisc and Whooping Crane v. MSI, Butler, Captain Productions and C-Tan Music*; Case No. 2006-007709 (Miami Dade Circuit Court).  Filing date: April 20, 2006 (pending).  Sample pleading, Exh. J.

*Pandisc and Whooping Crane v. 321 Music, WCM, Atlantic and APG*; Case No. 09-20505-Civ-Judge Moreno (S.D. Fla.).  Filing date: March 2, 2009 (settled). Sample pleading, Exh. K.

*Pandisc, Whooping Crane and Streetbeat Records v. Butler and 321 Music*; Case No. 10-59481 CA 08 (Miami-Dade Circuit Court).  Filing date: November 10, 2010 (adjudicated to judgment).  Sample pleading, Exh. L.

*Garfield Baker and Byron Smith v. WCM, APG, Pandisc and Whooping Crane; Nealy and MSI, Intervenors*; Case No. 14-cv-22403 (S.D. Fla.).  Filing date: June 27, 2014 (stayed).  Sample pleading, Exh. M.

*Baker and Smith v. WCM, APG, 321 Music, Butler, Pandisc and Whooping Crane*; Case No. 14-19088 (Miami-Dade Circuit Court).  Filing date: July 22, 2014 (dismissed for lack of prosecution after stay).  Sample pleading, Exh. N.

32.     At various times, Butler, 321 Music, C-Tan Music, Captain Productions, Pandisc, Whooping Crane, Garfield Baker and Byron Smith have each claimed to have either authored or owned all or portions of the musical works at issue in this case that Plaintiffs claim to own.  *See* Exhs. J-N.

33.     The common thread in all of these litigations, and in the instant case, is the allegation that Butler – MSI's former officer and undisputed author of the works at issue here –

10

granted rights to others for the commercial exploitation of songs in the MSI catalog that Plaintiffs claim they own and that Butler had no right to license.  TAC, at ¶¶ 25, 26, 36, 53, 62-78.

## ARGUMENT

## I.      SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is warranted when there is no genuine issue as to any material fact such that the moving party is entitled to relief as a matter of law.  While the court views the evidence in the light most favorable to the nonmovant, the "mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *Pierre v. Intuitive Surgical, Inc*., 2020 U.S. Dist. LEXIS 41474 (S.D. Fla. Mar. 6, 2020) (R. Ruiz, J.), at *11 (internal citations omitted). Factual disputes are not material "unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Id.*

Once the moving party has met its initial burden of identifying evidence it contends shows the absence of a genuine issue of material fact, the burden shifts to the defending party to "'set forth specific facts showing that there is a genuine issue for trial,' not just to 'rest upon the mere allegations or denials of the adverse party's pleading.'" *Id.* "[C]onclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion." *Román v. Spirit Airlines, Inc*., 2020 U.S. Dist. LEXIS 6988, at *6 (S.D. Fla. Jan. 14, 2020) (Ruiz, J.) (internal citations omitted).  As set forth below, the entire record of this case, including countless admissions by Plaintiffs, establishes as a matter of law that Plaintiffs are unable to prove that they own the copyrights in question or that their claims are timely.

11

## II.     PLAINTIFFS CANNOT PROVE THAT THEY OWN THE COPYRIGHTS IN THE EIGHT MUSICAL COMPOSITIONS AT ISSUE

In order to establish copyright infringement, Plaintiffs must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Latimer v. Roaring Toyz, Inc*., 601 F.3d 1224, 1232-33 (11th Cir. 2010) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc*., 499 U.S. 340, 361(1991)); *Bateman v. Mnemonics, Inc*., 79 F.3d 1532, 1541 (11th Cir. 1996).  While there is no dispute that Defendants have exploited the eight musical works in question, Plaintiffs' case fails on the first element, because they have produced no evidence that they own the copyrights covering these eight works.  While Plaintiffs claim rights to those works by "assignment" and additionally in some instances as "works made for hire," they have failed to produce a single written transfer document assigning rights to them, as required by the Copyright Act's stringent statute of frauds.  They have likewise adduced not one iota of evidence that any of these works otherwise qualifies as a work-for-hire under the clear standards of the Copyright Act, which their own witnesses readily acknowledge have not been satisfied.  Nealy Depo., Exh. B, at p. 193.

Indeed, rather than address these core deficiencies, Plaintiffs present an internally contradictory and incoherent morass of testimony and discovery responses that not only fails to establish ownership of any copyright, but affirmatively disproves it.  Their witnesses disagree about who authored certain of the works in question, who prepared or executed any of the allegedly "missing" assignment documents or whether they were even executed at all, and they repeatedly contradict statements and purported facts that appear in their own copyright registrations and sworn interrogatory responses.  Amidst these shifting stories and allegations, one thing is conspicuously missing – any viable theory and evidence of copyright ownership.

For this reason, there is no disputed issue of material fact that Plaintiffs do not and cannot prove that they own the copyrights at issue in this case.

A.   <u>**The Governing Principles of Authorship and Ownership of Copyrights**</u>

The basic principles of law governing authorship, ownership and transfers of copyright dispose of Plaintiffs' copyright claims.  The first of these bedrock principles is that copyright ownership "vests initially in the author or authors of the work."  17 U.S.C. § 201(a).  As the Eleventh Circuit has explained:

> authorship generally determines who has a possessory interest in a work.
> "Copyright in a work . . . vests initially in the author or authors of the work."  17
> U.S.C. § 201(a).  Indeed, authorship allows a person to claim copyright protection
> regardless of whether the work has been registered with the United States
> Copyright Office. . . . In consequence, to ascertain who holds a copyright in a
> work, we ordinarily must ascertain the identity of the author.

*Code Revision Comm'n v. Public.Resource.Org, Inc.*, 906 F.3d 1229, 1236 (11th Cir. 2018). Thus, as in all cases, determining who owns the copyrights in this case requires first identifying who authored the works, regardless of their registration status, as authorship remains the "*sine qua non* for any claim of copyright."  1 *Nimmer on Copyright* § 5.01 (2019).

The second principle is that the author retains ownership of the copyright unless he or she unequivocally transfers that copyright to another in a signed writing.  A transfer of copyright ownership "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  This requirement, sometimes called the Copyright Act's "Statute of Frauds," ensures that a copyright will "not be inadvertently transferred[,] . . . forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred . . . [and] provides a guide for resolving disputes."

31003/019/3574338.2
#42583456 v1

*Tjeknavorian v. Mardirossian*, 56 F. Supp. 3d 561, 565 (S.D.N.Y 2014) (citations omitted); *See also Tempest Publ'g, Inc. v. Hacienda Records & Recording Studio, Inc.*, 2013 U.S. Dist. LEXIS 159467 (S.D. Tex. Nov. 7, 2013) ("§ 204(a) protects authors by memorializing what rights are transferred" and ensuring no inadvertent transfer and genuine negotiation over rights) (citing and quoting *Konigsberg Int'l, Inc. v. Rice*, 16 F.3d 355, 356 (9th Cir. 1994)).

Because it serves to "protect authors from those claiming, contrary to the author's view of the facts, that he or she transferred rights in the work," § 204(a) is also "more stringent than traditional statutes of frauds," *Tjeknavorian,* 56 F. Supp. 3d at 565.  Accordingly, any writing purportedly transferring copyrights will be strictly scrutinized to ensure an unambiguous assignment of clearly identified rights signed by the author.  *See id*. (§ 204(a) "imposes a rigid default in favor of letting creators retain their interests in copyrighted work").  *See also Kihn v. Bill Graham Archives, LLC*, 445 F. Supp. 3d 234, 262 (N.D. Cal. 2020) ("Doubts as to whether the creator gave up rights enumerated under the Copyright Act should be resolved in favor of the creator and only 'the clearest language [will] divest the [creator] of the fruits of his labor.'"); *Mason v. Jamie Music Publ'g Co*., 658 F. Supp. 2d 571, 581 (S.D.N.Y. 2009) ("ambiguities or doubts concerning the scope of rights assigned by the [authors] . . . must be construed in favor of authors"); *Jim Henson Prods. v. John T. Brady & Assocs*., 16 F. Supp. 2d 259, 285 (S.D.N.Y. 1997) ("unless the author has given up his or her rights under copyright in a clear and unequivocal manner, he or she retains these rights"); *Cassway v. Chelsea Historic Props., I, L.P.*, 26 U.S.P.Q.2d 1791, 1793 (E.D. Pa. 1993) (court must construe any ambiguity "in favor of the author retaining his or her copyright").  Applying these legal principles to the facts of this case requires dismissal of Plaintiffs' claims.

**B.**     **Plaintiffs Are Neither the Authors Nor Owners of the Works In Question**

Plaintiffs have admitted the dispositive facts that (1) they are not the authors of the works in question, and (2) they cannot produce any writing transferring the copyrights to them.  To be sure, Plaintiffs have disclosed these facts begrudgingly and in piecemeal fashion over the life of this two-year-old case, but their slow drip of concessions leaves no doubt that they cannot establish that they own the copyrights in question.

With respect to the critical initial question of authorship, Plaintiffs' pleadings are notably silent, even though Plaintiffs have amended their complaint *four* times.  The current operative pleading, the Third Amended Complaint, fails to identify who authored the works in question or how they came to be owned by Plaintiffs.  The Third Amended Complaint simply states with no detail that "MSI registered a claim to ownership" of the eight musical compositions at issue.  *See* TAC ¶ 23-24.  As the Eleventh Circuit has held, however, copyright "inheres in authorship" rather than registration, which "is a separate issue from the existence of the copyright itself" and "does not confer copyright."  *Roberts v. Gordy*, 877 F.3d 1024, 1028-1029 (11th Cir. 2017) (erroneous copyright registration cannot take copyright away from true author) (citing *Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1531 (11th Cir. 1994)).  The fact that Plaintiffs obtained copyright registrations thus does not establish their ownership of the works in question.

After a series of depositions during which Plaintiffs' witnesses told conflicting and self-defeating stories as to authorship and the basis for their claim of ownership, Plaintiffs served "Supplemental and Amended" interrogatory responses stating what appears to be their current position.  Plaintiffs listed Butler as either the sole author or co-author of the eight musical works in question.  *See* Supplemental and Amended Responses and Objections to Defendants' First Set of Interrogatories, Response No. 1, Exh. V.  And for each of those works, Plaintiffs aver,

15

cryptically, that they "*obtained* the exclusive rights … for the life of the Copyrights."  *Id.*
(emphasis added).

Since the foregoing language hardly clarifies how or from whom Plaintiffs "obtained"
those rights and what those rights specifically encompassed, and since there is no signed writing
unequivocally transferring any rights to Plaintiffs, one must look to Plaintiffs' other interrogatory
responses (in both original and amended forms) to determine on what basis Plaintiffs claim to
own these works that were admittedly authored by Butler.  In response to an interrogatory asking
Plaintiffs to "state the basis of [Plaintiffs'] claim of copyright ownership," Plaintiffs attest that as
to each work at issue, Butler (and where applicable, his co-authors) "executed" either a
"Songwriter Agreement" or a "Recording Artist Agreement and Producer Agreement" which
assigned "exclusive rights of publication" to Plaintiff MSI.  *See* Responses and Objections to
Defendants' First Set of Interrogatories, Response Nos. 3 and 4, and Supplemental and Amended
Responses and Objections to Defendants' First Set of Interrogatories, Response No. 3.  Exh. V.
Again, however, the language is opaque to confer ownership.  It provides no detail on the
supposed agreements, what their terms were, and where they might currently be located.  More
importantly, rights of "publication" do not clearly embrace any transfer of copyright ownership.
Thus, even in sworn interrogatory responses (original and as amended), Plaintiffs were unable to
state clearly how and why they own the musical works at issue.

Since the actual agreements would be the only authoritative source of what rights, if any,
were transferred to Plaintiffs, Defendants duly requested them.  And it was only in response to
Defendants' document requests that Plaintiffs finally disclosed that *they have no writings
proving their ownership*.  In response to a series of requests asking them to produce "Any
agreement or other document by which [Plaintiffs] acquired or transferred any rights in" each of

16

the eight musical compositions at issue, Plaintiffs stated that "such documents were entered into between the aforementioned parties over thirty five years ago and appear to have been lost, accordingly Plaintiff does not have the documents in its possession and therefore cannot produce them." *See* Responses and Objections to Defendants' First Requests for Production of Documents, Responses Nos. 39-46, Exh. W.  Plaintiffs provide no explanation for when these documents were lost, how they were maintained before they were lost, or who maintained them. Plaintiffs' failure to produce any written proof whatsoever of a written assignment of rights signed by Butler is fatal.  In a context where the Copyright Act not only requires a writing, but requires a writing that is clear and unequivocal in divesting authors of their creations, the total absence of any writing is dispositive.  *See, e.g., Righthaven LLC v. Kelleher*, 2012 WL 527571 (D. Nev. Jan. 13, 2012) (dismissing copyright claim where 16 months into the lawsuit, plaintiff "has still not located the written assignment covering the work at issue").  *See also Caratzas v. Time Life, Inc.*, 1992 U.S. Dist. LEXIS 16285, at *7 (S.D.N.Y. Oct. 23, 1992) ("plaintiffs' failure to provide any writing evidencing a transfer of the ownership of the copyrights subsisting in the photographs prevents this [c]ourt from finding that plaintiffs are the owners of any copyright interest in the photographs").  This case is two years old, and Plaintiffs have made abundantly clear that they cannot produce any writing as required by the Copyright Act.  Their claims should be dismissed on this basis alone.

**C.**     **Plaintiffs' Self-Serving Copyright Registrations Do Not Cure Their Lack of Evidence of Ownership**

Plaintiffs have argued that their copyright registrations for the eight works at issue excuse the absence of any written transfer documents proving their ownership interest.  They purport to

17

rely on the presumption of validity that attaches to a copyright registration certificate pursuant to

17 U.S.C. § 410(c), which provides:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

However, a "certificate of registration . . . is not conclusive on the copyright ownership issue"

because the statutory presumption is "rebuttable," and to "rebut the presumption of validity, an

infringement defendant must simply offer some evidence or proof to dispute or deny the

plaintiff's *prima facie* case of infringement."  *Progressive Lighting, Inc. v. Lowe's Home Ctrs.,*

*Inc.*, 549 Fed. Appx. 913 (11th Cir. 2013) (granting summary judgment to defendants) (internal

citations omitted).  *See also, e.g.*, *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342

F.3d 149 (2d Cir. 2003) (registration "creates no irrebuttable presumption of copyright validity"

but merely "orders the burdens of proof" so that "where other evidence in the record casts doubt

on the question, validity will not be assumed").

Given the rebuttable nature of the presumption, "establishing a prima facie case of

ownership through valid registrations is also insufficient to defeat summary judgment on

standing to sue as copyright owner" where Defendant has offered evidence disputing the facts

stated in the registration certificate.  *Roberts v. Gordy*, 359 F. Supp. 3d 1231 (S.D. Fla. 2019).

For example, in *Progressive Lighting*, 549 Fed. Appx. 913, the Eleventh Circuit affirmed

summary judgment for a defendant that rebutted the presumption of validity attaching to

plaintiff's registration certificate.  *See also Bieg v. Hovnanian Enters., Inc.*, 157 F. Supp. 2d 475,

479 (E.D. Pa. 2001) (granting summary judgment to defendant that rebutted presumption of

copyright ownership attaching to registration).  Thus, when the defendant has rebutted the

31003/019/3574338.2
#42583456 v1

presumptive validity of the registration, the burden returns to the plaintiff to provide concrete evidence of copyright ownership, failing which, summary judgment should be granted.

Here, the entire body of evidence disclosed in discovery not only rebuts but affirmatively contradicts Plaintiffs' copyright registrations, which are apparently the sole source of Plaintiffs' claim of ownership, and leave Plaintiffs unable to meet their burden of proving that they own the copyrights in this case. This evidence falls into two broad categories: (1) documentary and third-party evidence and (2) testimony of Plaintiffs' witnesses.

1.  ***Documentary and Third-Party Evidence***

(a) *Registration Certificates Name Claimants Other Than Plaintiffs.*  While Plaintiffs allege that they have registered the eight works at issue "as the claimant with the United States Copyright Office," FAC ¶ 24, *none* of the certificates name Plaintiff Nealy as a claimant, which deprives him of standing. Copyright Registrations, Exh. F. Additionally, five of the eight registrations name a claimant other than MSI:

- The copyright claimant for "Freestyle Express" (Reg. No. SR 0000052651) is "In The Mix, Incorporated."

- The copyright claimant for "Computer Language" (Reg. No. PA 0000228955) is "Happy Stepchild Music Publ. Corp./Music Specialist Publ."

- The copyright claimant for "I Know You Love Me" (Reg. No. PA 0000328836) is "Music Specialists [sic] Publishing."

- The copyright claimant for "Jam The Box" (Reg. No. PA 000031089) is "Music Specialist Publishing."

- The copyright claimant for "When I Hear Music" (Reg. No. SR000059574) is "Music Specialist Publishing."

*Id.* Neither "In The Mix, Incorporated" nor "Happy Stepchild Music Publ." are parties to this case, so registrations in their name are not helpful to Plaintiffs. Plaintiffs have vaguely plead that

19

"MSI is *affiliated* with Music Specialist Publishing," the copyright claimant listed on four of the registrations noted above. *See* TAC ¶ 22. Whatever the status of those entities, they were not named as Plaintiffs in any of the four iterations of Plaintiffs' complaint, and if the facts stated in these registrations are presumptively correct, then neither Plaintiff Nealy nor Plaintiff MSI is a copyright claimant for five of the eight works that Plaintiffs claim were infringed.

(b) *Competing Registrations*. There are competing copyright registrations for certain works at issue. For example, while Plaintiffs claim rights to "Jam The Box" under Reg. No. PA 000031089, Whooping Crane claims to own the same song under Reg. No. PA 0000827298. Both registrations identify Butler as the author. *See Estate of Burne Hogarth,* 342 F.3d at 165-67 (multiple conflicting registrations, along with other evidence, rebutted presumption of validity and ownership). *See also* MSI'S Verified Statement of Facts, Case No. 06-7709, Exh. O, at ¶¶ 40-46, describing copyright registrations filed by Butler which conflict with copyright registrations MSI has filed.

(c) *Ownership Claims in Prior Litigations*. As set forth below, *see infra* at pp. 36-37, there have been multiple prior lawsuits with numerous parties claiming authorship and/or ownership of the copyrights in the MSI catalog, including the works at issue in this case. In addition to Plaintiffs, at various times Butler, 321 Music, C-Tan Music, Captain Productions, Pandisc, Whooping Crane, Garfield Baker and Byron Smith have each claimed to have either authored or owned all or portions of the musical works at issue here. This quagmire of competing claims rebuts any presumptive validity attaching to Plaintiffs' alleged copyright registrations.

(d) *Prior Agreements Resolving Ownership*. In similar fashion, throughout the years, various parties unrelated to Plaintiffs have entered into various agreements purporting to confirm

or transfer ownership in the MSI catalog.  For example, during 1989-1992, two companies wholly owned by Butler, Captain Productions, Inc. and C-Tan Music, allegedly transferred rights in various works claimed by Plaintiffs, including many of the works at issue in this case, to Pandisc and Whooping Crane.  *See* 2009 Complaint, Exh. E.  Following settlement of one of the earlier litigations, Garfield Baker – Plaintiffs' own 30(b)(6) deposition witness in this case – signed an agreement acknowledging that Butler was the sole author and a co-owner with Whooping Crane of six of the eight musical works at issue here.  *See* MSA ¶ 8, Exh. S.  When Mr. Baker signed that agreement, he made no mention of Plaintiffs' ownership of those same works, even though he now serves as Plaintiffs' chief witness in this case.

(e)  *Butler's Claims to Represent "Music Specialist."*  DMG, Atlantic's music clearance agent, duly obtained a license from Butler for Atlantic to interpolate "Jam The Box" in the musical composition, "In The Ayer."  The attorney representing Butler confirmed the license terms on behalf of "Tony Butler/Music Specialist," and the license was issued on that basis,[2] casting doubt on whether Plaintiffs even control the entity they purport to control.  *See* Exh. H. *See also* MSA, Exh. S, at ¶ 14 (Butler claiming "Music Specialist" to be one of "his" companies); Composite Exh. Q (2014 BMI royalty statement listing "Music Specialist" as a d/b/a of Butler).

## 2.  *Testimony of Plaintiffs' Witnesses*

There is no more powerful rebuttal of Plaintiffs' copyright registration certificates than the testimony of Plaintiffs' own witnesses, who repeatedly contradicted the information stated on those certificates:

---

[2] As of the issuance of the license to Atlantic, the corporate records of MSI indicated it had been dissolved and that Tony Butler was an officer of the company.  *See* Exh. A.

(a) *Plaintiff Sherman Nealy*.  Plaintiff Nealy signed the interrogatory responses both on his own behalf and on behalf of MSI, and attested that Butler was the "author" of each of the eight musical works in question and assigned those works to MSI in writing, as provided in the registrations.  However, he retracted or contradicted those interrogatory responses at his deposition:

> Q:      … If you weren't involved like that then how do you know that Tony Butler did not write the songs?
> A:      Because he wasn't a songwriter.
> Q:      So as far as you're concerned, he never wrote any song; is that right?
> A:      Pretty much.
> Q       Are you aware of any song that he wrote?
> A.      No.

Nealy Depo, Exh. B, at pp.123-124.  Nealy explained that Butler falsely took credit for songs he could not have written.  *Id.* at pp. 154-155 ("Tony Butler is not a songwriter.  He took credit that he wrote songs.  He took the credit for that.  He's not a songwriter, but he took credit from writing songs"); *Id.* at p. 158 ("Tony Butler is not a songwriter.  He was taking credit for the songs that other people was writing").  And, while he could not provide any written songwriter agreements by which Butler assigned his rights, Nealy insisted that Butler's name had been *incorrectly* listed as the author on those songwriter agreements, and that he had to instruct his attorney to rectify that error.  *Id.* at pp. 163-164.

To confuse matters further, Nealy testified that he believes that *he personally* owns the copyrights, even though none of the registrations list him as a claimant.  *Id.* at p. 19 (Q.  Do you know whether you individually own any of the copyrights that are at issue in the case?  A. Yes").  He also testified that the reason he and his company own the works in question is simply that he "paid" the songwriters (whom he could not identify) and engineers, *id*. at  pp. 228-229, notwithstanding the basic law that an author owns his or her work unless it is assigned in writing.

Not surprisingly, Nealy did not produce any evidence of payments made to songwriters. Plaintiffs cannot rely on the presumptive truth of the facts stated in their registration certificates when Nealy affirmatively disavows the identification of authorship and the validity of the very agreements identified on those registration certificates as the source of Plaintiffs' rights.  Indeed, if Nealy is to be believed, then he filed this lawsuit knowing the copyright registrations he relies on are false.  Regardless, his testimony standing alone rebuts any presumptive validity of the copyright registration certificates.

       (b) *Plaintiffs' Rule 30(b)(6) Witness, Garfield Baker*.  Plaintiff MSI identified as its Rule 30(b)(6) deposition witness Garfield Baker, an "artist" that created recordings for MSI, but was never an employee, officer or director.  *See* Nealy Depo., Exh. B, at p. 110.  As noted above, Baker claimed in an earlier lawsuit that he owned songs in the MSI catalog and agreed in writing that Butler and a third party owned six of the eight songs at issue in this case, with no mention of Plaintiffs.  MSA, Exh. S.  Baker changed his prior story and now claims that Plaintiffs own the songs in the MSI catalog.  At his deposition on behalf of MSI, Baker further asserted that *he* is a co-author and lyricist of certain of the songs at issue in this lawsuit, even though neither the Plaintiffs nor their copyright registrations identify him as such.  *See* Baker Depo., Exh. T, at pp. 30, 34, 45, 46-47 (claiming to be a co-author of "Jam The Box," "Lookout Weekend," "I Know You Love Me," and "The Party Has Begun").  To add insult to injury, Baker admitted that he has a financial interest in the outcome of this case pursuant to a written agreement, *id*. at 153-54, but is not a named plaintiff only because his name is erroneously excluded from the registration certificates:

> Q:    And why aren't you a plaintiff in this case? If you cowrote some of the songs that you allege the defendants infringed, why aren't you a party in this case?

23

A:     Well, Number 1, because I know that my name doesn't appear on the copyright registration, so immediately, you guys would move for summary judgment and I would be kicked out of court.

*Id.* at 231.  Thus, as with Nealy, Baker also testified that the information regarding authorship on the copyright registrations is false.

(c) *Byron Smith*.  Byron Smith was a colleague of Baker and claims to be a co-author with Baker and Butler of a number of songs at issue in this case.  *See* Smith Depo., Exh. U, at pp. 25-27 (claiming to be a co-writer of "I Know You Love Me," "Jam The Box," "Lookout Weekend," and "The Party Has Begun").  When confronted with the copyright registrations that listed Butler as sole author, Smith testified that those copyright registrations contained "false" information.  *Id.* at 63.

(d) *Jonathan Black*.  Plaintiffs' interrogatory responses state that a "consultant" named Jonathan Black prepared "songwriter agreements" and "artist recording agreements" pursuant to which Butler assigned ownership rights to Plaintiffs.  *See* Responses and Objections to Defendants' First Set of Interrogatories, Response Nos. 3 and 4, and Supplemental and Amended Responses and Objections to Defendants' First Set of Interrogatories, Response No. 3, Exh. V.  Not surprisingly, Black told a different story at his deposition.  Black testified that since he did not prepare or personally sign the registration certificates, he also did not prepare any corresponding agreement by which Butler assigned any rights.  *See* Black Depo., Exh. C, at pp. 91-92 ("… if I didn't do the registration I didn't do a songwriters contract on a particular song. I really had no involvement with it").  When shown registration certificates for six of the eight works at issue, Black testified definitively that he had neither prepared the copyright registration nor any associated contract.  *Id.* at pp. 53-57, 72-74 ("Fix It In The Mix," "Computer Language," "Freestyle Express," "Lookout Weekend," "The Party Has Begun," and "When I Hear Music").

24

With respect to the remaining two works, "I know You Love Me" and "Jam The Box," Black equivocated that he could not be sure, because he did not recognize certain features of the copyright registrations even though they followed his alleged form and the timing suggested that he had prepared them. *See id*. at pp. 66, 133, 202-211.  Needless to say, Black has no "songwriter agreements," "artist recording agreements" or any documents in his possession that would support Plaintiffs' claim of ownership.

Given this muddle of contradictions, it would be a perverse result to accord any presumptive validity to Plaintiffs' copyright registrations.  Plaintiffs are not even the named registrants for most of the works at issue, and numerous third parties claim rights to these same musical works.  More importantly, Plaintiffs and their own witnesses contradict the statements of authorship on the registration certificates and the validity of the so-called "agreements" identified on the registration certificates as their source of rights.  Plaintiffs cannot claim rights by assignment from Butler while disavowing his authorship in the first place.  Coupled with the fact that Plaintiffs cannot produce a single document that assigns them any rights to satisfy the Copyright Act's writing requirement, Plaintiffs are not only deprived of any presumption of validity but they are incapable of meeting their burden of proof to show copyright ownership.  Simply put, now that Defendants have rebutted the presumptive validity of Plaintiffs' registrations, it is incumbent on Plaintiffs to provide proof of ownership, and they cannot do so as a matter of law.

To the extent Plaintiffs try to use their own contradictions to conjure up an "issue of fact" on ownership, there is none.  Courts "will not recognize inconsistencies in a nonmovant's own sworn testimony alone as sufficient to create a genuine issue of material dispute." *Reeves v. Miami-Dade Cty*., 2012 U.S. Dist. LEXIS 190125, at *3 (S.D. Fla. July 27, 2012) (citing *Van T.*

*Junkins & Assocs, Inc. v. U.S. Indus., Inc*., 736 F.2d 656, 657 (11th Cir. 1984)).  *See also CTB,*

*Inc. v. Hog Slat, Inc.,* 954 F.3d 647, 666 (4th Cir. 2020) ("it is well established that a genuine

issue of fact is not created where the only issue of fact is to determine which of the two

conflicting versions of a party's testimony is correct") (citations omitted); *UA Local 343 of the*

*United Ass'n of Journeymen & Apprentices of the Plumbing and Pipefitting Indus. of the U.S*., 48

F.3d 1465, 1473 (9th Cir. 1994) ("internal inconsistencies in a party's own testimony fail to

create a genuine issue of material fact").  Amidst all of the contradictions, the undisputed fact

remains that Plaintiffs have not and do not claim to have authored the eight works at issue, and

they cannot prove the existence of any writing otherwise assigning them the copyrights.  Thus,

Plaintiffs have no evidence to support the necessary element of copyright ownership.

**D.**     **None of the Works At Issue Qualifies as a Work Made For Hire**

Plaintiffs' pleadings make no mention of the term "work made for hire," which denotes a

special category of works where ownership vests with an employer or a party specially

commissioning a work created by another.  *See* 17 U.S.C. § 101.  However, Plaintiffs'

interrogatory responses state that for certain works, Jonathan Black, MSI's "consultant",

prepared agreements that "contained 'employee/work for hire' clauses" by which Butler

transferred his rights to Plaintiffs.  *See* Responses and Objections to Defendants' First Set of

Interrogatories, Response Nos. 3(d)-(e), 4(a)-(c), Exh. V.  Of course, Plaintiffs have produced no

such agreements, and in keeping with their penchant for contradiction, Black testified that Butler

*never* created music as "works for hire" for Plaintiffs, and that Black *never* filed a single work-

for-hire copyright registration.  *See* Black Depo., Exh. C, at pp. 129, 174.  Thus, Plaintiffs once

again have no evidence to support their scattershot allegations.[3]

But notwithstanding Plaintiffs' contradictions, Plaintiffs have indisputably confirmed that

none of the works qualifies as a work-for-hire.  The Copyright Act identifies two types of work-

for-hire:

> (1) a work prepared by an employee within the scope of his or her employment; or
> (2) a work specially ordered or commissioned for use as a contribution to a collective
> work, as a part of a motion picture or other audiovisual work, as a translation, as a
> supplementary work, as a compilation, as an instructional text, as a test, as answer
> material for a test, or as an atlas, if the parties expressly agree in a written instrument
> signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.  The key to the first category is that the work is created "within the scope" of

the employee's duties.  Here, Nealy was adamant that Butler was not a songwriter and that Nealy

had to take steps to stop Butler from taking credit as a songwriter.  *See* Nealy Depo., Exh. B, at

pp. 154-55.  More pointedly, Nealy was explicit that he never engaged Butler as a composer:

> Q:     Now I'm asking you, was he ever on the payroll of Music Specialist, Inc. to be a
>        songwriter?
> A:     No.

*Id.* at 193.  This testimony eliminates any claim that Butler "prepared" the works at issue within

the scope of his employment.

Nor can Plaintiffs argue that Butler's musical works fall within the second category of

works for hire.  None of the musical works at issue were specially commissioned for use in the

niche categories identified by the statute, such as motion pictures or translations.  Moreover, this

category requires a written agreement, but Plaintiffs admitted in their document request

---

[3] As set forth in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 752 (1989), when
considering whether one is truly an employee for "work for hire" purposes, courts evaluate many factors, including
the method of payment, the provision of employee benefits, and the tax treatment of the hired party.  Plaintiffs have
been unable to provide evidence to support any of these factors.

27

responses that they have no such documents.  *See* Responses and Objections to Defendants' First

Requests for Production of Documents, Response No. 14, Exh. W.  Indeed, as stated above,

Black, the alleged preparer of such agreements, claimed he never drafted any work-for-hire

documents.  *See, e.g., Foster v. Lee*, 93 F. Supp. 3d 223, 229 (S.D.N.Y. 2015) (granting

summary judgment against work-for-hire claim where no writing or proof work was created

within scope of employment); *Getz v. Eichner*, 1997 U.S. Dist. LEXIS 9267, at *9-10 (S.D.N.Y.

July 1, 1997) (same).  The references to "works for hire" in Plaintiffs' interrogatory responses

are as bereft of factual support as Plaintiffs' underlying claim of ownership.

## III.   DEFENDANTS' LICENSES FROM A CO-OWNER SERVE AS A COMPLETE DEFENSE TO INFRINGEMENT

Even if Plaintiffs had produced evidence of their ownership interest in the copyrights at

issue, they would still be unable to maintain an infringement action against Defendants.

Plaintiffs have sworn in interrogatory responses and confirmed in testimony that Butler is, at

minimum, a co-owner of these copyrights.  That concession is fatal, because Defendants'

licenses from Butler serve as a complete defense to infringement under basic rules of copyright

co-ownership.

Co-owners of a copyright are "treated generally as tenants in common, with each co-

owner having an independent right to use or license the use of a work, subject to a duty of

accounting to the other."  *Broadcast Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254,

1258 at n.2 (11th Cir. 2014) (quoting legislative history of Copyright Act).  Accordingly, a

license from one co-owner immunizes the licensee from claims of infringement by any other co-

owner.  *See Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007) ("a licensee is not liable to a non-

licensing co-owner for use authorized by the license, because the licensee's rights rest on the

license conveyed by the licensing co-owner"); *McCants v. Tolliver*, 2011 U.S. Dist. LEXIS 77841, at \*5 (N.D. Ohio July 14, 2011) ("joint copyright owner cannot sue his co-owner or his co-owner's licensee for infringement").

Plaintiffs cannot contest that Butler is a least a co-owner with a percentage share interest in the copyrights asserted in this case. *See* Supplemental and Amended Responses and Objections to Defendants' First Set of Interrogatories, Response No. 1(a)(1)-(8), Exh. V (noting Butler's percentage share of copyrights). For example, with respect to the composition "Jam The Box," Plaintiffs' interrogatory responses identify the "Author(s)" as follows: "Tony Butler (Tony Butler Writer's Share 50% of Copyrights, MSI/MSP Publisher's share 50% of Copyrights)." The other works contain similar entries identifying Butler as a co-owner of the copyrights. *Id.* When presented with his own sworn interrogatory responses, Nealy readily conceded that they indicated co-ownership:

> Q.   And what I'm asking you about this document that you swore under penalty of perjury is true is, does that reflect the reality of the situation, that Tony owns 50 percent and MSI owns 50 percent of the publisher's share of Jam The Box?
> A.   Yes.

Nealy Depo., Exh. B, at p. 244. *See also* Black Depo, Exh. C, at pp. 137-38 (description from interrogatory means that copyright ownership was split). Moreover, there is no dispute in this case that Atlantic obtained a license from Butler to use "Jam The Box," and that Defendants WCM and APG obtained a license from Butler to administer all the musical compositions at issue in this case. *See* Exhs. H and I. Since Defendants received licenses from a person who Plaintiffs concede is a co-owner of the copyrights in question, none of the Defendants can be held liable as an infringer, providing an independent ground for granting summary judgment against Plaintiffs' claims of infringement.

29

## IV.  PLAINTIFFS' CLAIMS ARE BARRED BY THE COPYRIGHT ACT'S THREE-YEAR STATUTE OF LIMITATIONS

Even if Plaintiffs' claims were substantively viable, which they are not, they would nevertheless be barred by the Copyright Act's three-year statute of limitations.  Pursuant to 17 U.S.C. § 507(b), "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  Plaintiffs commenced this action on December 28, 2018, so the relevant date for limitations purposes is December 28, 2015.  As Plaintiffs have repeatedly pled, since 2008, Defendants have been openly exploiting and/or licensing the works Plaintiffs claim to own, some of which became "smash hits."  *See* TAC ¶¶ 26-27, 53, 55-56, 58, 60, 62, 65, 68, 71, 74, 84-85, 97, 111, 121.  Plaintiffs filed this lawsuit in 2018, which is way beyond three years after their claim accrued.

Courts apply the statute of limitations differently depending upon the nature of the copyright claim asserted.  Where there is no question that defendant exploited a copyrighted work but only whether plaintiff owns that copyright, the "gravamen" of the case is deemed an *ownership* dispute, regardless of whether it is styled by a plaintiff as one for "infringement."  Such ownership claims accrue only once and expire altogether if not brought within three years of the date when plaintiff knew or should have known his or her ownership rights were being violated.  *Webster v. Dean Guitars*, 955 F.3d 1270, 1276-77 (11th Cir. 2020).  *See also, e.g., Kernel Records Oy v. Mosley*, No. 09-21597, 2013 WL 3762452 *5 (S.D. Fla. July 16, 2013) ("An ownership claim accrues only once, 'when the [p]laintiff had reason to know of the alleged injury'") (citation omitted).  Here, Defendants do not contest that they exploited the works for many years.  Likewise, by their own admissions, Plaintiffs have known their purported ownership rights were allegedly being violated since 2008, so their claims styled as infringement

30

claims are actually disputes over copyright ownership and are extinguished altogether.  Nealy
Depo, Exh. B, at p. 68.

In contrast, when there is a dispute over whether the defendant actually used or created
something "substantially similar" to plaintiff's work, the claim is deemed an "ordinary"
infringement claim and accrues separately for each alleged violation.  *Webster*, 955 F.3d at 1275-
76 (citing *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014)).  In such instances,
while the claim is not entirely extinguished, the plaintiff "can gain retrospective relief only three
years back from the time of suit," *Petrella*, 572 U.S. at 677, regardless of whether the plaintiff
knew or should have known of the infringement during that three-year window.  *See Sohm v.
Scholastic Inc.*, 959 F.3d 39, 51-52 (2d Cir. 2020).  Accordingly, even if Plaintiffs' claims truly
sounded in infringement, they would still be limited to only those damages that were incurred
after December 28, 2015.

**A.      The Gravamen of This Case Is A Dispute Over Copyright Ownership**

Because the essence of this case is a dispute over copyright ownership, Plaintiffs' claims
accrued more than a decade ago and are barred in their entirety under the Eleventh Circuit's
holding in *Webster*, whose facts are strikingly similar to the instant case.  The plaintiff-appellant
in *Webster* purported to own a copyrighted design painted on a musician's guitar, and sued a
guitar manufacturer, who claimed to have authorization from the musician to use the design.
*Webster*, 955 F.3d at 1272-73.  Though the case was styled as "copyright infringement," the
Eleventh Circuit agreed with the District Court that the claim was "properly characterized . . . as
one primarily concerning copyright ownership," because plaintiff-appellant's "main argument is
that he owns the lightning storm graphic and the [a]ppellees have reproduced it without his
consent.  The parties agree that [the accused manufacturer] has reproduced the graphic on several

31

guitar models without [plaintiff's] permission, *leaving ownership the only disputed issue*." *Id.* at 1276 (emphasis added). Having thus categorized the claim, the court held that "a claim concerning mainly ownership accrues only once . . . when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his ownership rights." *Id.* Since the plaintiff-appellant knew for more than three years that others were violating his ownership rights, the Eleventh Circuit affirmed summary judgment that the claim was barred by the statute of limitations. *Id.* at 1276-77.

*Webster* follows a long line of similar authorities, where the gravamen of the dispute is copyright ownership and where the plaintiff disputes that the defendant obtained lawful authorization to use the copyrighted work from a third party. For example, in *Simmons v. Stanberry*, No. 10-5815, 2012 WL 1004857, at *4 (E.D.N.Y. Mar. 23, 2012), plaintiff sued various music companies for "copyright infringement," where plaintiff disputed the purported ownership rights of a third party who had authorized defendants' use. Like Plaintiffs in the instant case, the *Simmons* plaintiff "fault[ed] [defendants] for not determining who 'created or currently owned the rights to'" the work in question. The court reviewed "the complaint as a whole and not simply the causes of action pleaded," noted the repeated references to "[p]laintiff's ownership throughout," and held the claim to be time-barred as an ownership dispute about which plaintiff had been aware for more than three years. *Id*. at **3-4.

Similarly, in *Sanchez v. Hacienda Records and Recording Studio, Inc.*, No. 11-3855, 2015 WL 1219651 *1 (S.D. Tex. 2015), where plaintiff sued the defendant record company for "copyright infringement," the defendant "did not dispute that it had recorded and distributed the song, but did dispute [plaintiff's] ownership and claimed that it acted with the rightful copyright owner's permission." *Id.* at *3. The court granted summary judgment for defendant, reasoning

that the copyright ownership dispute had accrued three years before expiration of the limitations period.  *Id.  See also Black Box Royalties, Inc. v. Universal Music Publishing, Inc.*, No. 15-4013, 2017 WL 35087278 \*\*6-7 (N.D. Ga. Feb. 21, 2017) (dismissing infringement claim where "gravamen of Plaintiffs' copyright claims are ownership because Plaintiffs assert that Defendants have no right to copy, sell, distribute, or license any of the disputed songs").

Throughout these cases, the courts did not rely on whether the claim was one for "copyright infringement," but rather, whether the ultimate issue for determination is one of ownership, rather than whether defendant actually used the plaintiff's purported copyright.  *See also, e.g., Narrative Ark Entm't LLC v. Archie Comic Publ'ns, Inc.*, No. 16-6109, 2019 WL 4142362 \*4 (S.D.N.Y. Aug. 29, 2019) (courts examine substance of claim, rather than label, to determine if claim is infringement or ownership); *Rice v. Music Royalty Consulting, Inc.*, 397 F. Supp. 3d 996, 1009 (E.D. Mich. 2019) (same); *Master Mind Music, Inc. v. Block Enters., LLC*, No. 12-162, 2012 WL 6625754 \*4 (N.D. Ga. Dec. 18, 2012) ("when resolution of the ownership claim is fundamental to the infringement claim . . . a time-barred ownership claim bars the infringement claim.").

Plaintiffs' claims in the instant case stand on the exact same footing as *Webster* and these additional authorities.  Here, Defendants do not dispute that they have exploited the musical compositions in question, but rather claim that they received authorization from Butler, who Plaintiffs insist did not have those rights to grant.  This case involves none of the typical copyright infringement issues relating to whether the works were "original," whether Defendants had "access" to Plaintiffs' works or whether there is "substantially similarity" between the musical works, and thus "leav[es] ownership the only disputed issue." *Webster*, 955 F.3d at 1276.

31003/019/3574338.2
#42583456 v1

Plaintiffs' pleadings make this reality plain.  They allege that Plaintiffs have "been the owners of [the works in question] since their creation" and they did not "assign, license, sell and/or divest themselves of their ownership interests" to any third party.  TAC ¶ 25.  They further allege that Defendants WCM and APG "knew or should have known prior to entering into the Artist Agreement that 321 [Butler's company] never owned or controlled the subject copyrights," and that the Defendants "failed to conduct adequate due diligence to investigate the ownership" of the copyrights in question and "participated in the unlawful conveyance of partial ownership" of those copyrights.  *Id.* ¶¶ 26, 34, 62, 65, 68, 71, 74, 78, 83, 90, 91, 111, 126, 129.  The case, in other words, simply requires resolution of whether Defendants obtained authorization to use the works in question from the right party.

Plaintiffs, moreover, have described the dispute as one purely of ownership.  As detailed below, the MSI catalog has been the subject of *five* prior litigations, dating back to 2006.  *See infra* at 35.  While there have been different combinations of parties and claims as to particular works, the common thread is the allegation that Butler granted licenses to works that Plaintiffs claim they own.  Plaintiff Nealy is, of course, fully aware of such lawsuits, *see* Nealy Depo., Exh. B, at pp. 136, 141, and that this ownership dispute has been ongoing for years:

> Q.      We talked earlier about the fact that there are a number of lawsuits that are still going on, one of which has been stayed, one of which was previously resolved, all having to do with the ownership of the music catalog of Music Specialist, Inc.  Do you recall those conversations?
> A.      Yes.
> Q.      Okay.  And this lawsuit is the most recent example of these ongoing disputes over ownership of the MSI catalog, correct?
> A:      Yes.

*Id.* at pp. 202-203.  *See also* MSI's Verified Statement of Facts in Support of Motion for Summary Judgment in Circuit Court Case No. 2006-007709-CA-01, verified by Nealy

(describing prior lawsuits as disputes over Butler's exercise of ownership rights in musical works Plaintiffs claim to own).  Exh. O.  With only ownership requiring resolution, the question that remains is whether Plaintiffs had notice of their potential claims prior to December 28, 2015. There is no dispute that Plaintiffs knew and/or should have known of their ownership claims dating at least as far back as 2008.

**B.      Plaintiffs Knew and Should Have Known of Their Ownership Dispute Since At Least As Far Back As 2008**

As set forth in *Webster*, 955 F.3d at 1276, copyright ownership claims accrue "when [plaintiff] knew, or reasonably should have known, that his ownership rights . . . were being violated."  Copyright plaintiffs are "charged with a duty of diligence," so that the statute of limitations begins to run when the plaintiff "possesses information fairly suggesting some reason to investigate whether he may have suffered an injury at the hands of a putative infringer." *Sieger Suarez Architectural P'ship v. Arquitectonica Int'l Corp.*, 998 F. Supp. 2d 1340, 1354-55 (S.D. Fla. 2014) (citations omitted).  As the Eleventh Circuit has held, "With copyright rights come concomitant responsibilities, including the responsibility to assert those rights in a timely manner after exercise of diligence." *Calhoun v. Lillenas Publ'g Co.*, 298 F.3d 1228, 1236-37 (11th Cir. 2002) (Birch, J., specially concurring).

Although any number of events can trigger a duty to investigate – courts have referenced "suspicions," "storm warnings," and "smoke," among others – once triggered, knowledge of what a reasonable investigation would have uncovered is imputed to the plaintiff regardless of whether plaintiff ever actually undertook that investigation.  *See, e.g., William A. Graham Co. v. Haughey*, 568 F.3d 425, 438 (3d Cir. 2009) (if plaintiff "had sufficient information of possible wrongdoing to place [her] on inquiry notice or to excite storm warnings of culpable activity,"

then the "burden shifts to [plaintiff] to show that [she] exercised reasonable due diligence and yet [was] unable to discover [her] injuries"); *Krist v. Scholastic, Inc.*, 415 F. Supp. 3d 514, 528-29 (E.D. Pa. 2019) (where defendant shows "storm warnings," burden shifts to plaintiff to show that it "exercised reasonable due diligence and yet was unable to discover its injuries"); *Wolf v Travolta*, 167 F. Supp. 3d 1077, 1094, 1097, n.12 (C.D. Cal. 2016) (regardless of actual investigation, equity will impute to a litigant knowledge of facts that would have been revealed by a reasonable investigation) (c*iting Woods v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515 (9th Cir. 1983)).

Here, the record is replete with evidence that Plaintiffs have had both constructive and actual notice of their claims for many years prior to the December 28, 2015 statute of limitations cutoff.  As a threshold matter, MSI was dissolved in 1986, and had completely ceased doing any business when Nealy was first incarcerated in 1988.  *See* Nealy Depo, Exh. B, at p. 132 (from 1986 on, MSI has not been "engaged in in the sale or licensing of any of its musical works").  From that point forward and as conceded by Nealy, MSI maintained no contracts and granted no permissions for anyone to exploit the MSI catalog, and never resumed developing or commercially exploiting music at any time, including since 2017, when MSI was reinstated.  *Id.* at pp. 94-95.  Nealy agreed that any commercial exploitation of any of Plaintiffs' supposed copyrights after 1988, when he first when to prison, would have been unauthorized, and, by necessary implication, would have given rise to claims for infringement.[4]  *Id.* at pp. 94-95.

---

[4] To the extent Plaintiffs argue that Nealy's incarceration itself excuses his delay, the law of this Circuit is directly to the contrary.  *See Paulcin v. McDonough*, 259 F. App'x 211, 213 (11th Cir. 2007); *McComb v. Jones,* No. 16-61104, 2017 WL 2380285 *3 (S.D. Fla. May 8, 2017).

31003/019/3574338.2
#42583456 v1

Plaintiffs were also surely aware when the instant action was commenced that they faced a potential time-bar, and yet pled no facts excusing their delay. *See Eddie v. Bank of Am., N.A.*, 2018 WL 573406 (M.D. Fla. Jan. 26, 2018) (plaintiff invoking the "discovery rule" as exception to statute of limitations must plead "(1) the time and manner of discovery; and (2) the inability to have made earlier discovery despite reasonable diligence."); *Varner v. Domestic Corporation*, No. 16-22482, 2017 WL 3730618 *9 (S.D. Fla. Feb. 7, 2017) (same); *Holliday v. Lloyd's Underwriters at London*, 2017 U.S. Dist. LEXIS 212501, at *9 (M.D. Fla. Dec. 28, 2017) (rejecting application of discovery rule where complaint failed to include facts supporting its application). Indeed, Plaintiffs' pleadings stress the exact opposite, protesting how notorious, famous and commercially successful the alleged infringements were.

Plaintiffs' diligence in filing suit must be measured in the context of years of inaction while their purported music allegedly topped sales charts. Against this backdrop, there is overwhelming, undisputed evidence that Plaintiffs had both constructive and actual notice more than three years prior to the filing of this case in December 2018 that their alleged copyright ownership interests were being violated, including:

    1. ***Prior Lawsuits Over the MSI Catalog***. The MSI catalog, which encompasses all of the music at issue in this case as well as other works, has been the subject of numerous prior litigations dating back to 2006, including the following:

- *Pandisc and Whooping Crane v. MSI, Butler, Captain Productions and C-Tan Music*; Case No. 2006-007709 (Miami Dade Circuit Court). Filing date: April 20, 2006 (pending). Sample pleading, Exh. J.

- *Pandisc and Whooping Crane v. 321 Music, WCM, Atlantic and APG*; Case No. 09-20505 (S.D. Fla.). Filing date: March 2, 2009 (settled). Sample pleading, Exh. K; *See also*, Exh. E.

- *Pandisc, Whooping Crane and Streetbeat Records v. Butler and 321 Music*; Case No. 10-59481 CA 08 (Miami-Dade Circuit Court);  Filing date: November 10, 2010 (adjudicated to judgment). Sample pleading, Exh. L.

- *Baker and Smith v. WCM, APG, Pandisc and Whooping Crane*; *Nealy and MSI, Intervenors*; Case No. 14-cv-22403 (S.D. Fla.);  Filing date: June 27, 2014 (stayed). Sample pleading, Exh. M;  *See also*, Exh. X.

- *Baker and Smith v. WCM, APG, 321 Music, Butler, Pandisc and Whooping Crane*; Case No. 14-19088 (Miami-Dade Circuit Court);  Filing date: July 22, 2014 (dismissed for lack of prosecution after stay). Sample pleading, Exh. N.

While these various suits involved different constellations of parties and musical works, collectively, they all embrace the same cast of characters, the same alleged catalog of works, and the same basic dispute over whether Butler was authorized to license the works in the MSI catalog.

MSI was a party to the 2006 case in Florida state court and MSI and Nealy intervened in the 2014 case in Florida federal court.  Exh. X.  Defendants were named in both the 2009 and 2014 federal cases.  As noted above, Nealy testified to his awareness of at least two of these cases, and agreed that this lawsuit is "the most recent example of these ongoing disputes over ownership of the MSI catalog."  Nealy Depo., Exh. B, at pp. 141, 203.  The sheer breadth and length of these disputes surely put Plaintiffs on notice that their purported copyrights were in jeopardy.

2.   ***The Crane Meeting and the Court's Acknowledgment of Plaintiffs' Lack of Diligence***.  As early as 2008, Nealy was asserting ownership claims inextricably intertwined with those he makes here.  Immediately upon his first release from prison in 2008, Nealy learned that Robert Crane, the principal and owner of Pandisc and Whooping Crane, was "using his music."  Nealy Depo., Exh. B, at p. 68.  These companies have been named parties in all of the prior lawsuits noted above, and like Defendants in this case, they claim to have received rights to

38

various songs in the MSI catalog from Butler and/or his companies.  Exhs. J-N.  Nealy's

consultant, Jonathan Black, set up a meeting on June 9, 2008 to discuss Crane's alleged

unauthorized use of the music in MSI's catalog (the "Crane Meeting").  Nealy Depo., Exh. B, at

p. 68.  When asked how Nealy learned of the alleged violations, Black testified "I would believe

he probably spoke to Tony Butler.  I mean, everybody, this is material that was out in the market.

So he could have walked in a store and found that out back in the 90's or 2000."  Black Depo.,

Exh. C, at p. 167.  As Nealy testified, "I remember talking to them concerning whatever they was

doing with any music that Music Specialist owned," and that "I was letting them know that I was

home and they had my music" and that he did not agree to such use.  Nealy Depo., Exh. B, at pp.

77-79.

Crane recalled that Nealy asked for the Crane Meeting "to discuss the subject songs and

claimed that he had an ownership interest in the songs," *see* Declaration of Crane, Exh. AA, at ¶

6, and that he advised Nealy that Nealy's claims were untimely:

> We advised Mr. Nealy that any claims he purported to have were not timely since
> he had not claimed any rights to the songs since the Agreements were executed.
> Mr. Nealy asserted he had saved the paperwork to support his claims but neither
> he nor Mr. Black brought any of these alleged documents to our meeting.  Mr.
> Nealy never provided those alleged documents.

*Id.* ¶ 8.  Thus, as of June 2008, Nealy was undisputedly aware that others were exploiting the

MSI catalog without his permission and with Butler's allegedly "unlawful" authorization.  And

yet, Nealy never provided any proof of ownership, and did not even tell Crane to stop exploiting

MSI's alleged copyrights, because he claimed he did not know "the level what they was doing"

and did not have a lawyer at the time.  Nealy Depo., Exh. B, at pp. 83-84.

Plaintiffs have never sued Butler, despite the fact that Butler's conduct is at the core of

this ownership dispute, because Nealy "didn't know how to get in touch with him" and instead

wanted to go after those who "made money off of" the music.  Nealy Depo., Exh. B, at pp. 144,

191.  Moreover, Plaintiffs did not sue Crane until 2017, when they intervened in an ongoing

litigation involving the same Defendants named in this case and asserted the same claims

asserted here.  While partly permitting the intervention as to certain works, the court nevertheless

acknowledged Plaintiffs' lack of diligence:

> In the Crane [d]efendants' opposition response, they argue that Nealy and MSI
> were on inquiry or constructive notice for decades that their copyrights had been
> infringed because they had not received royalties since the 1990s. . . . They then
> argue that, in the alternative, Nealy and MSI knew about their potential rights at
> least in June 2008, when Nealy and his attorney had a meeting with Robert Crane
> and his attorney to discuss the subject copyrights.
> . . .
> Nealy and MSI also do not contradict that they first contacted the Crane
> Defendants in 2008 to assert their rights in the subject songs.
> . . .
> Nealy and MSI fail to articulate how or why they first learned of their rights in
> this case in January 2016.  That position is questionable given the lack of
> explanatory detail and considering that they first contacted the Crane [d]efendants
> in 2008 to assert their rights over the same works.  Moreover, the issue is not
> simply when Nealy and MSI *actually knew* about their interests in this case, but
> when they *should have known . . . The Court suspects that Nealy and MSI should
> have known about their interests in this case much earlier than January 2016
> given their prior history with the parties*.

*Baker v. Warner/Chappell Music, Inc.*, No. 14-22403, 2017 WL 4577247 **4-6 & n.7

(S.D. Fla. Oct. 12, 2017) (emphasis added) (internal quotations omitted).[5]  That lack of

---

[5] As Judge Goodman recognized, "although the statute of limitations may later bar some
or all of the intervenors' claims, it does not prevent the intervenors from asserting their claims in
the first place."  The reason is that the standard for permitting intervention and the assertion of
claims (essentially a motion to dismiss standard) is far more relaxed than that required of party
seeking to avoid summary judgment.  *See, e.g., Fed. Sav. & Loan Ins. Corp. v. Falls Chase
Special Taxing Dist.,* 983 F.2d 211, 216 (11th Cir. 1993) ("Any doubt concerning the propriety
of allowing intervention should be resolved in favor of the proposed intervenors because it
allows the court to resolve all related disputes in a single action."); *CMFG Life Ins. Co. v.
Harrison*, No. 415-287, 2016 WL 6476953 81, n.1 (S.D. Ga. Oct. 28, 2016) ("The well-pleaded
non-conclusory factual allegations asserted in a motion to intervene, and accompanying
pleading, are taken as true for purposes of evaluating the motion.").

diligence carries over to the instant litigation, which stems from the same question of whether Butler was authorized to license the MSI catalog that MSI now claims as its own.

3. ***Widespread Dissemination of the Allegedly Infringing Works***.  Plaintiffs allege that Butler unlawfully licensed their song "Jam The Box" to Defendant Atlantic for use in the song "In The Ayer," which was released in March 2008.  TAC ¶¶ 79-81, 84.  According to Plaintiffs, "In The Ayer" sold millions of copies, was a "smash hit," "topped various airplay and sales charts," "was widely played on the air waves," and was licensed for use on numerous television programs on a wide range of channels, ranging from MTV and Cinemax to The Comedy Channel.  *Id.* ¶¶ 53, 84-85.  Plaintiffs similarly allege that their song "Lookout Weekend" was licensed for use in another song that sold 11 million copies.  *Id.* ¶ 28.  These allegations standing alone warrant summary judgment on statute of limitations grounds.  *See also* Synchronization License Chart, Exh. Y (highlighting uses of various compositions at issue in film and on popular television shows, such as "The Ellen DeGeneres Show" and "So You Think You Can Dance").

Courts have held that a reasonably diligent copyright owner is necessarily on constructive notice of its claim where the accused music is commercially successful.  *See, e.g.*, *Luar Music Corp. v. Universal Music Grp., Inc.*, 847 F. Supp. 2d 299, 310 (D.P.R. 2012) (internal citations omitted)*; White v. Warner-Tamerlane Publ'g Corp.*, No. 16-5831, 2017 WL 4685542 *3 (C.D. Cal. May 22, 2017) (dismissing ownership claim where "no indication in [p]laintiff's complaint that [p]laintiffs did not know of [d]efendants' use of their track or could not have discovered the contested ownership rights until recently, especially given the popularity of the track.").

4. ***BMI Royalty Statements***.  Plaintiffs Nealy and MSI are members of the performing rights society known as Broadcast Music, Inc. ("BMI"), *see* Nealy Depo., Exh. B, at p. 95, which

41

licenses public performances of musical compositions on behalf of songwriters and music publishers and pays them corresponding royalties. *See Broadcast Music, Inc. v. DMX, Inc.*, 683 F.3d 32, 35 (2d Cir. 2012). Songwriters and publishers have to register with BMI to receive accounting statements and royalty income. Its repertoire database is the music industry's authoritative source for determining who is claiming rights in a musical composition. Blietz Depo., Exh. Y, at pp. 42-43; Caren Depo., Exh. G, at pp. 58-59. Nealy admitted to receiving royalty checks from BMI during the period between his two incarcerations. *See* Nealy Depo., Exh. B, at pp. 95, 100.[6] According to BMI's records, Nealy received a check for $25.27 on September 27, 2010 and a check for $35.02 on September 18, 2015, both of which predate the December 28, 2015 statute of limitations cutoff. The royalty statements that accompanied those checks indicated that royalties were generated by performances of the composition "Fix It In The Mix," one of the works at issue in this lawsuit. *See* Composite Exh. Q. Nealy also recalled receiving at least a third check from BMI in the approximate amount of $7,000. Nealy Depo., Exh. B, at p. 101.

Remarkably, even though Nealy knew that any exploitation of his purported copyrights would have been unauthorized in 2010 or 2015, since his business was entirely dormant, he took no steps to determine why he was receiving this money. Nealy testified that he did not know "where it came from," but since the check was in his name, he "cashed it." Nealy Depo., Exh. B at pp. 100-102. He disregarded royalty statements that would accompany any check and which would have revealed which songs were being exploited, and never thought to call BMI, whose

---

[6] Although admittedly not a songwriter, Nealy registered as a songwriter with BMI in order to receive songwriter royalties for works in the MSI catalog that he admits were not authored by him.

phone number is listed on the first page of every royalty statement, along with the language, "Questions About Your Statement?  Call (615) 401-2000 or visit bmi.com."  *Id.* at p. 103.  And when Nealy was asked whether he made any effort to determine how or which of his musical works were being exploited, he said he "didn't know what was going on" and "didn't do nothing."  *Id.* at pp. 102-103.  *See also* Composite Exh. Q.

To make matters worse, the September 18, 2015 BMI royalty statement directed to Nealy expressly identified Defendant WCM as administrator of Plaintiffs' alleged song "Fix It In The Mix":



| Affiliate: NEALY SHERMAN | | | | | | | |
|---|---|---|---|---|---|---|---|
| Account No: 550097621 | | IP No: 00563.83.24.36 | | | | | |
| Distribution Date:  September 18, 2015 | | U.S. Performance Period: 1ST QUARTER 2015 | | | | | |
| | | International: 149TH ACCOUNTING | | | | | |

**Important Message**: *Royalties listed in the Administration Services section of your BMI Royalty Statement are calculated based on instructions and financial information provided to BMI by your music publisher and are related to your publisher's direct agreements with the licensee that performed your music.*

**Admin Services o/b/o Warner/Chappell Music Inc. - U.S. Performances - Internet Audio**

| Source | | | Performance | | | | | |
|---|---|---|---|---|---|---|---|---|
| Title | Work Number | Use | Count | Period | Your % | WH | Royalty Amt |
| **ITUNES RADIO** | | | | | | | |
| FIX IT IN THE MIX | 000422755 | FF | 951 | 20151 | 50.00% | | $0.01 |
| **ITUNES RADIO  Total** | | | | | | | **$0.01** |
| **U.S. Performance - Internet AudioTotals** | | | | | | | **$0.01** |

**Admin Services o/b/o Warner/Chappell Music Inc. - U.S. / International Performances - Summary**

| Type | | | | | |
|---|---|---|---|---|---|
| Country | | Summary Group | Withhold Amt | Royalty Amt | Total Earnings |
| **U.S.** | | | | | |
| UNITED STATES | | INTERNET AUDIO | $0.00 | $0.01 | $0.01 |

Exh. Q at MSI0000760.  In other words, prior to the statute of limitations cutoff of December 28, 2015, Nealy admittedly received documents showing that one of the Defendants was not only licensing, but administering, MSI's alleged copyrights.  When confronted with this document, which Nealy himself provided in this case, Nealy demurred that the reference to Defendant WCM "didn't register."  Nealy Depo., Exh. B, at pp. 103-105.

31003/019/3574338.2
#42583456 v1

In fact, WCM was listed as the administrator of the compositions covered by the APG/321 Music Agreement from July 2008 onward.  *See* Blietz Decl., Exh. F, ¶ 6.  Had Nealy reviewed BMI's online records, accessible to anyone with an internet connection, he would have learned that WCM was administering the MSI catalog for years.  He also would have learned that as of May 2014, the account holder for the fictitious entity known as "Music Specialists Publishing" was listed at BMI as "Tony Butler, d/b/a Music Specialist Publishing," and that BMI was accounting to Butler for royalties earned by many of the works at issue.  *See* Composite Exh. Q.

5.   ***Lack of Royalties Despite Widespread Dissemination***.  Other than the above-mentioned BMI checks, which were specifically attributable to performances of "Fix It In The Mix," there is no evidence that Nealy or MSI received any royalties for any of the other songs at issue in this case despite their public, widespread dissemination.  *See* TAC ¶ 78 ("Artist/Warner Chappell has earned and continues to earn significant revenue from their unlawful licensing and administering of Plaintiffs' copyrighted musical works and have made no payments to the Plaintiffs").  Courts have often held that the failure to receive royalties despite the commercial success of allegedly infringing music puts Plaintiffs on notice of their claims for statute of limitations purposes.  *See, e.g. Cole v. Blackwell Fuller Music Publ'g, LLC,* No. 16-7014, 2018 WL 4680989 *5 (S.D.N.Y. Sept. 28, 2018) ("Plaintiff was on notice of his [copyright ownership] claims at least as of the time he failed to receive royalties, despite the widespread distribution and exploitation of the [c]ompositions, which results in his claims being time-barred").  *See also, e.g.*, *Mahan v. Roc Nation, LLC*, 634 Fed. Appx. 329, 331 (2d Cir. 2016) (finding copyright ownership claim time-barred where plaintiff had "received no royalties for the sale of the [a]lbums for fourteen years"); *Carell v. Shubert Org., Inc*., 104 F. Supp. 2d 236, 249 (S.D.N.Y.

31003/019/3574338.2
#42583456 v1

2000) ("non-payment of royalties should have put [plaintiff] on notice of" violation of plaintiff's ownership rights).

The foregoing facts eliminate any possible issue of fact regarding Plaintiffs' diligence in investigating and pursuing copyright ownership claims that accrued more than a decade ago. Plaintiffs ignored all of the prior litigations involving the MSI catalog, failed to investigate others' use of their alleged copyrights including "smash hits" that infringed those alleged copyrights, did not bother to question the royalty statements they received from BMI (but cashed the accompanying checks), while never questioning the fact that other exploitation of their alleged copyrights yielded no income. Plaintiffs did not even access the wealth of public information available, such as the BMI database of online records, which would have informed Plaintiffs that others were licensing the MSI catalog. Moreover, Nealy's repeated excuses that he did not act because he "didn't know what was going on," could not "get in touch" with Butler, and had no lawyer, *see* Nealy Depo., Exh. B, at pp. 80-81, 83-84, 92, are insufficient to excuse Plaintiffs' delay. There is, in fact, no need for the Court to analyze the "reasonableness" of Plaintiffs' investigation of their claims, because they undertook no investigation at all. Accordingly, Plaintiffs' copyright claims are time-barred in their entirety.

**C.      If the Court Deems This to Be an Infringement Dispute, Plaintiffs Would Be Limited to Three Years of Damages**

Under binding Eleventh Circuit precedent, this case presents an ownership dispute that expired long before 2015. However, if the case were deemed an infringement dispute – contrary to *Webster's* clear holding – Plaintiffs would be limited to damages accruing after December 28, 2015, three years before they filed suit. In *Petrella v. Metro-Goldwyn-Mayer, Inc.*, the Supreme Court held that copyright "infringement is actionable within three years, and only three years, of

its occurrence" and that "the infringer is insulated from liability for earlier infringements of the same work." 572 U.S. at 671. Since damages "outside the three-year window" before suit was filed are not recoverable, *id.* at 677, Plaintiffs may not seek damages for any period earlier than December 28, 2015.

In earlier proceedings in this case, Plaintiffs invoked the "discovery rule" in an effort to escape this three-year limitation of remedies. While the Eleventh Circuit has not expressly adopted the rule in copyright infringement cases (though *Webster* effectively adopts it for ownership disputes), some district courts have invoked the discovery rule to hold that the "statute of limitations period began to run when Plaintiff learned of or, in the exercise of reasonable diligence, should have learned of the alleged copyright infringement." *See Sieger Suarez*, 998 F. Supp. 2d at 1354-55. The discovery rule only governs *when* a cause of action for infringement accrues and does not extend the period of damages more than three years under any circumstances. *See id.* at 1355. For example, in *Sohm v. Scholastic Inc.,* 959 F.3d at 51-52, the Second Circuit held that, even if the Plaintiff had no reason to learn of the infringement during the three years prior to suit and thus was not time-barred altogether, relief was nevertheless limited to the three years prior to suit.[7] The court noted that "*Petrella's* plain language explicitly

---

[7] The Second Circuit is a leading copyright jurisprudence circuit, frequently relied upon by the Eleventh Circuit. *See, e.g.*, *Lil' Joe Wein Music Inc. v. Jackson*, 245 Fed. App'x. 873, 877 (11th Cir. 2007) (noting the Second Circuit has approved the grant of summary judgment in copyright cases as it allows courts to put 'a swift end to meritless litigation' and avoid long and costly trials.") (quoting *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980)); *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1545 (11th Cir. 1996) (Eleventh Circuit's adoption of Second Circuit's *Altai* test to determine the scope of copyright protection in computer program, citing *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992)); *Webster v. Dean Guitars*, 955 F.3d 1270 (11th Cir. 2020) (adopting approach used by, *inter alia*, the Second Circuit, that copyright ownership claim accrues when plaintiff learns, or should as a reasonable person have learned of the violation of its ownership rights).

46

dissociated the Copyright Act's statute of limitations from its time limit on damages" and held, "a three-year lookback period from the time a suit is filed" determines "the extent of the relief available" regardless of any application of the discovery rule.  *Id.* at 52.  *See also Werner v. BN Media, LLC*, No. 19-610, 2020 WL 4728814 *3 (E.D. Va. Aug. 7, 2020).  Accordingly, even if this case is classified as one for infringement and Plaintiffs get the benefit of the discovery rule, Plaintiffs are still limited to only three years of relief.

In fact, Plaintiffs have already agreed to this three-year limitation in prior litigation.  In 2017, they sought to intervene in *Baker v. Warner/Chappell Music, Inc.*, before Judge Goodman (Case No. 14-22403, S.D. Fla.).  Exh. X.  Their intervenor complaint alleged infringement of a long list of songs, including those asserted in this case, against the same Defendants in this case.  In allowing them to intervene but precluding them from adding the works they assert in this case, Judge Goodman relied on Plaintiffs' concession that they were at best limited to three years of damages:

> Nealy and MSI also do not contradict that they "first contacted the Crane [d]efendants in 2008 to assert their rights in the subject songs[.]".  But they argue that the nine-year delay between then and when they sought relief in court is inconsequential because "a copyright owner need not challenge every actionable infringement and can defer suit until [the owner] can estimate that litigation is worth the effort." . . . Relying on *Petrella*, the intervenors contend that they are "entitled to retrospective relief for infringement that occurred in the three years before they filed their complaint."

*Baker*, No. 14-22403, 2017 WL 4577247 **4-6 & n.7.  In order to support their intervention and explain their delay, Plaintiffs stressed that they could only seek damages for the three years prior to filing their intervenor complaint.  That statement constitutes a binding judicial admission they cannot now disavow.  *See Amtrust N. Am., Inc. v. Safebuilt Ins. Servs., Inc.*, 2016 WL 6561548 *4 (S.D.N.Y. Nov. 3, 2016) ("A court can appropriately treat statements in briefs as binding

47

judicial admissions of fact"); *Brandt v. Bassett*, 855 F. Supp. 353, 357, n.2 (S.D. Fla. 1994) (statement in prior brief deemed judicial admission that statute of limitations precluded claims from prior date). The fact that Plaintiffs expressly relied on the three-year limitation in such closely related prior litigation further precludes them from claiming damages prior to December 28, 2015.

## CONCLUSION

The Court should grant summary judgment dismissing all of Plaintiffs' claims for three independent and dispositive reasons. First, Plaintiffs cannot meet their burden of proving that they own the copyrights in question. They claim ownership by assignment from Tony Butler, and yet are unable to produce any signed writing proving any such transfer, as required by the Copyright Act's stringent writing requirement. They likewise cannot rely on their copyright registrations for a presumption of validity when they repeatedly contradict the information set forth on those registration certificates with respect to the critical elements of authorship and assignment. They likewise affirmatively disavow facts that would be necessary to classify any of the copyrights as works-for-hire, and are thus left with no competent proof of ownership.

Second, Plaintiffs concede that Tony Butler is, at a minimum, a co-owner of the copyrights in question. There is no dispute that Defendants obtained licenses from Butler to exploit the copyrights at issue in this case. Since Defendants received licenses from a co-owner, they are immune from suit by Plaintiffs as a matter of law.

Third, Plaintiffs' claims are barred by the Copyright Act's three-year statute of limitations. Since this case hinges solely on the question of whether Plaintiffs own the copyrights in question, Plaintiffs' claims are properly classified as an ownership dispute, for which Plaintiffs' cause of action accrues only once. Since Plaintiffs undisputedly had actual and

constructive knowledge of an alleged violation of their ownership rights significantly earlier than the three years prior to filing their lawsuit, their claims are extinguished altogether. Moreover, even if this case were deemed an infringement suit, Plaintiffs would in any event only be entitled to damages for the three years prior to the commencement of the action under Supreme Court precedent.

Respectfully submitted,

GRAY ROBINSON, P.A.
*Attorneys for Defendants Warner Chappell*
*Music, Inc., Atlantic Recording Corporation, and*
*Artist Publishing Group, LLC*
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Phone: (305) 416-6880
Fax: (305) 416-6887
karen.stetson@gray-robinson.com

By: /s/ Karen L. Stetson
      Karen L. Stetson
      Florida Bar No.: 742937
      Jonathan L. Gaines
      Florida Bar No.: 330361

and

Jonathan Z. King (*admitted pro hac vice*)
COWAN, LIEBOWITZ & LATMAN, P.C.
*Attorneys for Defendant, Atlantic Recording*
*Corporation*
114 West 47th Street
New York, NY 10036-1525
Phone: (212) 790-9238
Fax: (212) 575-0671
JZK@cll.com

31003/019/3574338.2
#42583456 v1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed with the

Clerk of the Court and furnished via CM/ECF to all participating recipients, on this 26th day of

October, 2020.

By: <u>/s/ Karen L. Stetson</u>

31003/019/3574338.2
#42583456 v1